## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**WILLIAM ROBERT DUNFEE,**<br><br>    **Defendant.** | **Case No. 23-cr-36-RBW** |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William Robert Dunfee to 48 months of incarceration, 24 months of supervised release, a $125 special assessment, and $2,000 in restitution. This sentence is above the advisory guidelines range of 12 to 18 months, as calculated by the Probation Office.

### I.     INTRODUCTION

The defendant, William Robert Dunfee, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Dunfee, a pastor at a church in Ohio, arrived early at the U.S. Capitol on January 6 with the intent to "give 'em Scripture" and "work the crowd." Standing on a raised flowerbed, and sermonizing with fervor, he spoke through a megaphone to the gathering crowd about the certification of the Electoral College vote, which would be taking place that day. From about 9:25 a.m. until approximately 1:45 p.m., Dunfee encouraged the crowd to "Rise Up!", declared his intention to "take [the Capitol]", and threatened police officers protecting the Capitol building that "We want Donald Trump, and if Donald Trump is not coming, we are taking our house!"

Dunfee's orations culminated in physical actions against police officers at 1:45 p.m. and then again at 2:00 p.m., when Dunfee led rioters in a collective push against the barricades that marked the restricted perimeter on the East Front. As Dunfee pushed against the barricades, he warned police officers that they would have to "fight" the crowd. At 2:00 p.m., Dunfee and other rioters overwhelmed and overran the police line and advanced to the Capitol building. Dunfee was unable to get into the building because the Rotunda Doors were locked, and he was forced to retreat due to police action. However, he stayed close by to congratulate other rioters on shutting down the certification, proclaiming, "Hallelujah . . . Mission accomplished!"

The government recommends that the Court sentence Dunfee to 48 months of incarceration for his conviction of violating 18 U.S.C. §§ 231(a)(3) and 1752(a)(1). A 48-month sentence reflects the fact that the advisory guideline range does not adequately reflect the gravity of Dunfee's conduct, including his leadership role, abuse of his position of trust as a pastor,

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

and corrupt intent to use threats of violence to interfere with the certification of the 2020 Presidential election.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts filed in this case, ECF No. 1, and the stipulation of the parties for a bench trial, ECF No. 61, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election.

### B.     William Robert Dunfee's Role in the January 6, 2021 Attack on the Capitol

*Invitation to Others and Travel to Washington, D.C.*

After the 2020 Presidential election, on December 27, 2020, William Robert Dunfee, who is a pastor in Warsaw, Ohio, asked members of his congregation to travel with him to Washington, D.C. on January 6, 2021, with the express goal of undermining the results of the 2020 election. Dunfee declared, "They used to tell us, you know what, you settle your differences at the ballot. How did that work out for us? It's not over . . . We are heading to D.C. Who's going with us? January 4th through 6th . . . Are you ready?" Ex. 209 (timecode 20:09).

On or about January 6, 2021, Dunfee traveled from Ohio to Washington, D.C. Dunfee arrived on the East Front of the Capitol grounds at approximately 9:00 a.m., just outside the restricted perimeter, which was marked by waist-high metal bike rack fencing and patrolled by U.S. Capitol Police ("USCP") officers. Dunfee knew that Congress was meeting at the Capitol on January 6, 2021 to certify the Electoral College vote and that Vice President Mike Pence would preside over the certification proceedings. Ex. 1001.

*The Defendant's Actions on January 6, 2021*

At approximately 9:25 a.m., Dunfee stood on a raised flowerbed on the East Front of the U.S. Capitol grounds and used a megaphone to address the crowd. Immediately, Dunfee began to encourage the crowd to instill "fear" into members of Congress. He told the crowd: "This election has been stolen right out from underneath of our noses and it is time for the American people to rise up. Rise up! Rise up! Today is the day in which it is that these elected officials realize that we are no longer playing games . . . Listen, our elected officials, our Senators, our House Representatives, the Congressmen need to understand they work for us, and they need to fear us." Ex. 202 and 202a (timecode 03:00).

He made his intentions clear, telling another member of the crowd that he was with "Grassroots and Christian Patriots . . . here to stop the steal and do what we can do." Exs. 200, 200a, and 1001.



*Still from Exhibit 202 – Dunfee standing in flowerbed and addressing crowd on East Front*

Dunfee worked the crowd for hours, standing on a raised platform and speaking in a megaphone to amplify his message. Dunfee encouraged the crowd to act and frequently gave suggestions and orders to facilitate a riot:

- At approximately 11:55 a.m., Dunfee referred to metal fencing barricades on the restricted perimeter and rhetorically asked, "What's the purposes of these gates right here? What's the purpose of these gates? It's to keep you away from our house." Exs. 213, 301 and 301a (timecode 00:00). An unidentified rioter then yelled back, "Let's go in," to which Dunfee responded into the megaphone, "We're going to. We're going to. We intend to take it." Exs. 301 and 301a.

- At approximately 1:15 p.m., Dunfee used a megaphone to tell the crowd: "They just objected to Arizona," as shown in Exhibits 203 and 203a, referring to Congress's certification of the Electoral College ballots submitted by Arizona. *See also* Ex. 1001.

- At approximately 1:20 p.m., Dunfee proclaimed: "Remember this. If they let us down, we are going to our house! . . . Protect the Constitution! . . . We are going to our house!" Exs. 203 and 203c (timecode 00:00).

- At approximately 1:30 p.m., the defendant encouraged the mob: "Donald Trump is leading the crowd . . . Fight for Trump! Hold the line!" In response, the crowd began a "Fight for Trump!" chant. Exs. 203 and 203e (timecode 00:00).

- At approximately 1:35 p.m., the defendant addressed USCP officers directly, warning them, "Mister police officers, we want you to understand something. We want you to understand something. We want Donald Trump and if Donald Trump is not coming, we are taking our house! We are taking our house! . . . Give us Trump or give us our house!" Exs. 203 and 203f (timecode 00:00).

Not only did Dunfee concern himself with what was happening on the East Front of the Capitol building, he actively encouraged rioters to move to the West Front, where other rioters were violently fighting police officers. Dunfee declared, "Reinforcements around back. If you are able to move around back, they need some support around back." Exs. 203, 203d (timecode 00:00), and 003.

5

Members of the crowd listened to Dunfee's words and repeated many of the chants that he started. *See, e.g.*, Exs. 203 and 203f. Dunfee held himself out as someone whom the crowd should listen to by standing on a raised platform and using a megaphone. He implored individuals to listen to him when he spoke. Exs. 203, 203a ("Listen up! Listen up!"), 307 and 307a (Dunfee: "Okay now listen, give me one minute. Please hear me. Listen to me, one minute. Listen! Listen!" Unidentified Individual: "Let him talk. Let him talk".) The crowd also reacted to Dunfee's statements. When Dunfee proclaimed, "If they let us down, we are going into our house," a member of the crowd shouted back, "It looks like the people here are planning to go straight to the front door, in the event that this does not go well." Exs. 203 and 203c. Members of the crowd looked to Dunfee to organize efforts to obstruct the certification. Exs. 301, 301a (Unidentified Individual to Dunfee: "Let's go in." Dunfee: "We're going to.")



*Still from Exhibit 203 – Dunfee standing in flowerbed and addressing crowd*

Other members of the crowd, who have since been arrested, remember Dunfee as a leader interested in breaching the barricades. For instance, Clay Norris, who was on the East Side of the Capitol and arrested for his conduct on January 6, 2021 (24-CR-358-TJK), told investigators: "That preacher . . . we all came together . . . I said something to the effect of, 'They keep getting away with this. They're gonna keep doing this for every election forever.' Then, the preacher said, 'Don't you worry sir, we're going to do something, and they're not gonna to get away with this.'" *See* Attachment A. Norris summarized, "That preacher took it another level." *See id.* Norris also remembered meeting Dunfee in text messages sent prior to Norris's arrest, admitting to others that he could not deny meeting Dunfee. Attachment B. He told others that Dunfee brought people with him on January 6 and that Dunfee had "40 people with him under his command." Attachment B.



*Still from Attachment B*



*Still from Attachment B*



*Still from Attachment B*

Other January 6 rioters have remembered Dunfee trying to recruit them to help him breach the barricades. John Douglas Wright, a convicted January 6th defendant (21-CR-341-CKK), who was identified by FBI Special Agent A.M. at trial as an individual present in a number of photographs alongside Dunfee (January 22, 2024 Tr. 43:1-45:25), informed the government that Dunfee recruited him and five other individuals to push metal barricades down.[2] According to Wright, an unidentified male in a beige coat approached Wright and told him that Dunfee wanted to meet Wright. Wright was then taken to Dunfee. According to Wright, Dunfee told Wright, Norris, and four other men that they should spread themselves out along the metal fencing and engage in a coordinated effort to push against police officers to breach the barricades. According to Wright, Dunfee advised Wright and five others that Dunfee would signal to the group to begin pushing against the barricades and that his signal would be a prayer.

Additionally, Dunfee's associate ("Associate 1") approached members of the Proud Boys on the East Front in a similar effort to recruit individuals to breach the barricades. Associate 1, who is affiliated with Dunfee through religious organizations such as "Pass the Salt Ministries" and appears on Dunfee's church's website,[3] was in close proximity to Dunfee on the East Front throughout the morning of January 6. Exs. 103, 202, 301. Associate 1 is shown in multiple exhibits, including Exhibit 204, using a megaphone to speak to the crowd on Dunfee's behalf, calling him "Pastor Bill."

---

[2] The government intends to call Wright as a witness at sentencing.
[3] *Available at* https://www.nbmwarsaw.org/ministries (Associate 1 pictured in "Compassionate Outreach Ministry" section) (last visited August 22, 2024).



*Still from Exhibit 204 – Associate 1 providing the crowd
with an update from "Pastor Bill"*

At approximately 11:45 a.m., Associate 1 approached members of the Proud Boys, a group that played a central role in setting the January 6th attack on the Capitol into motion. *See* Ex. 301. Although the audio quality is poor, Associate 1 can be heard speaking to members of the Proud Boys group using phrases like "take that building," and referencing the steps and balconies of the Capitol building. Ex. 301.



*Still from Ex. 301 – Associate 1 (blue) approaching Proud Boys members*

Minutes later, at 11:46 a.m., Associate 1 returned to find Dunfee by the raised flowerbeds. Ex. 103. Associate 1 and Dunfee then approached the group of Proud Boys together. Exs. 301, 103, 103a (timecode 00:41), and 103b. Dunfee appeared to speak with members of the Proud Boys group and then departed with Associate 1. *Id.* It is unknown what, if anything, Dunfee said to Proud Boys members during their interaction.



*Still from Ex. 301 – Associate 1 (blue) returning with Dunfee (yellow) to speak with Proud Boys*

However, in a separate trial, Travis Nugent, a Proud Boys member who was convicted of crimes related to his conduct on January 6, 2021, testified that he was approached on the East Front by someone who identified himself as a "pastor." *United States v. Nordean, et al.*, March 20, 2023 Tr. 14467:19-25 (Attachment C). Nugent testified that the "pastor," whom he identified as Associate 1, "asked for somebody within leadership [of the Proud Boys] and then asked if we would be willing to go through the gates to the steps of the Capitol." Tr. 14468:1-4, 144470:1-14. According to Nugent, the Proud Boys declined to assist Associate 1. 14468:10-18.

Nugent's account of Dunfee using emissaries like Associate 1 to recruit men to breach barricades mirrors Wright's account.

Two days after the Capitol riot, on January 8, 2021, Associate 1 appeared on a podcast where he described Dunfee as a "leader," who was "work[ing]" the crowd and "pumping 'em" up until they were "ready" for action. *See* Attachment D. Notably, Associate 1 describes working in concert with Dunfee to mentally prepare the crowd to breach the barricades:

> We seen [sic] Wednesday, I think, on the South side [sic] of the building we were on, probably five or six thousand people. These people are looking for a leader. These people, ten to two [o'clock], they listened as Pastor Bill stood on that platform with that bullhorn, and he kept just pumping 'em and pumping 'em. But he give 'em scripture, he give 'em the Constitution. And buddy when it was time to knock the gates over, they were ready. But he, for four hours, we got to work that crowd. And it was intense.

*See* Attachment D.

### The Breach of the Barricades

Intent on breaching the barricades and gaining access to the Capitol building, Dunfee physically engaged with USCP officers on the barricades who were protecting the restricted perimeter. At approximately 1:45 p.m., Dunfee, holding onto the metal bike rack fencing and lifting the fencing into the air, participated in a first push of the metal barricades against USCP officers. *See* Exs. 204a (timecode 00:00), 228, 411, 412, and 413. This was the first occasion on January 6, 2021, when rioters became violent with police officers on the East Front of the Capitol grounds.



*Close-up from Exhibit 411 – Dunfee (yellow), Norris (purple), and Wright (red) pushing metal fencing against USCP officers with inset showing Dunfee with his hands on the barricades*

After the initial push, Dunfee and other rioters briefly breached the restricted perimeter. Ex. 412. USCP officers were able to re-secure the perimeter and Dunfee was forced back behind the barricade line.



*Exhibit 412 – Dunfee (yellow) breaching the barricades after pushing fencing at approximately 1:45 p.m.*

12

Thwarted in his attempts to reach the Capitol building, Dunfee next tried to convince USCP officers to let him through the barricades by insisting that rioters only wanted to go to the steps of the building and by also making thinly veiled threats. Specifically, he told one USCP officer that the officers needed to let the rioters through "for safety's sake," Ex. 303c (timecode 00:00), and warned another USCP officer that the rioters would "push if we gotta push," Ex. 303b (timecode 00:00). Again, during this time, Dunfee held himself out as a leader of the crowd. He intended to speak for the crowd when addressing police officers. Exs. 303, 303a, 303b. Members of the crowd looked to Dunfee to negotiate with USCP officers on behalf of the mob. (Exs. 303, 303a) (unidentified male speaking to Dunfee, "[Y]ou do what you got to do to negotiate").

When police refused to let the crowd through, Dunfee decided that he needed to resort to additional force. He pushed barricades against officers on a second occasion at approximately 2:00 p.m., this time, using his back. Exs. 203i, 205, 211, 303d (timecode 00:28), and 304. As he pushed, Dunfee told officers, "Alright, we are going to the steps. We are going to the steps. . . You can fight us," referring to himself and other rioters. Ex. 303d.



*Still from Exhibit 303d – Dunfee (yellow) pushing metal fencing against USCP officers on a second occasion at approximately 2:00 p.m.*

Dunfee was one of the first rioters to breach the barricades after this second push. Ex. 102a (timecode 04:10). Once Dunfee broke through the barricades, a USCP officer in riot gear attempted to apprehend Dunfee as he advanced towards the Capitol building. *Id.* Dunfee eluded capture, moving to his left and using other rioters and police officers to put distance between himself and the USCP officer. *Id.* The USCP officer followed Dunfee's path and grabbed Dunfee's jacket, attempting once more to stop Dunfee from advancing towards the Capitol building. *Id.* Dunfee spun around to break free from the USCP officer, tripping a fellow female rioter in doing so and she fell to the ground. *Id.* As Dunfee continued toward the Capitol building, he raised his arms above his head in triumph. Exs. 102, 102a, and 303d.



*Still from Exhibit 226 – Dunfee (yellow) walking backwards towards the Capitol*

Dunfee made his way to the East Central Steps of the Capitol building where another police line had formed to protect the building and those inside. Exs. 106 and 106a (timecode 04:40). Dunfee was near the front of the rioters, directly in front of the officers, almost the entire time that the police line held on the stairs. *Id.* Once the police line on the stairs fell, rioters, including Dunfee, surged onto the terrace level of the Capitol building. Dunfee was one of the first rioters to travel up the steps. Ex. 304. USCP officers pushed the defendant back and told him to stop moving forward. Dunfee, however, ignored officers' verbal commands and continued to move forward with his arms raised above his head. *Id.* He was able to surge forward again, this time making it to the Rotunda Doors. Exs. 308 and 308a (timecode 00:00). When he arrived at the doors, Dunfee turned to the crowd and yelled, "The doors are locked!" *Id.* Soon thereafter, Dunfee was again pushed back by police officers defending the Capitol building. Exs. 107, 107b, 304, 308, 308a.

At approximately 2:10 p.m., Dunfee remained near the Rotunda Doors, where a large crowd had gathered, and a small number of police officers sought to defend the Capitol building. There, at approximately 2:20 p.m., Dunfee observed other rioters breaking the glass windows on the Rotunda Doors. Dunfee and other rioters were then sprayed with pepper spray by the officers protecting the doors. Exs. 220, 306, 309, and 416. Dunfee experienced the effects of the pepper spray and was temporarily unable to see. Dunfee retreated from the Rotunda Doors but remained in close proximity. Ex. 306.

At approximately 2:47 p.m., after the joint session of Congress had been suspended, an unidentified male rioter exiting the Capitol building addressed Dunfee, who was still near the Rotunda Doors, stating, "We did it. We got our job done." Dunfee replied, "You get in?" The unidentified male rioter responded, "We did it, we shut 'em all down. We did our job." In response,

15

Dunfee told the crowd, "Hallelujah . . . Mission accomplished!", leaving no doubt about his purpose for being there that day. Exs. 207, 207a (timecode 00:00), and 207b. Dunfee continued to remain outside of the Rotunda Doors where, at approximately 2:52 p.m., he high-fived an unidentified male rioter who was wearing a gas mask and exiting the Capitol building. Exs. 227 and 227a (timecode 00:00).



*Still from Exhibit 227 – Defendant high-fiving an individual in a gas mask*

*Defendant's Statements After January 6, 2021*

Dunfee had no regrets about his conduct and expressed no remorse about the riot or his role in it. On or about May 30, 2021, Dunfee told his congregation in Ohio: "We show up January 6th at the Capitol building, right? To let it be known that we are not going to stand back and let an election be stolen. That we are going to hold our legislators accountable, and so on and so forth? And what did that get us? Huh? We are all deemed what? Huh? Bunch of terrorists, right?" Ex. 206 (timecode 09:40). He continued, calling the rioters "patriots," and insisting, "I can tell you, having been there, that . . . we were surrounded by patriots. Many, many, many, many patriots . . . You are not stealing this election." *Id.*

Dunfee continued to deny wrongdoing even after his arrest. In November 2022, Dunfee wrote an article for the Wisconsin Christian News. In the article, titled "Pastor Bill Dunfee –

Targeted By the FBI," Dunfee falsely claimed that he "did not cause the civil discord," "did not obstruct official business," and, contrary to the evidence, "prevented the Capitol Building barricade from being broken." Ex. 421. Dunfee again referred to rioters as "patriots" and falsely claimed there was "no violence." *Id.* He ended the article by saying that the "charges are false" and solicited donations through "TheChristianRevolution.Net." *Id.*

In addition to fundraising through his article, Dunfee also fundraised based on his arrest through his church. On November 27, 2022, Dunfee posted an almost identical article to the one described above to his church's Facebook page, except that he solicited donations through his church's website. Dunfee also recorded a fundraising video, which was posted to a podcast website. In the video, Dunfee doubled down on his claims that he was just at the Capitol building protesting. Ex. 221. According to accounting documents filed by Dunfee, he has raised approximately $25,250 through in-person and online fundraisers for his legal fees. ECF No. 82.

## III.    THE CHARGES AND PLEA AGREEMENT

On February 1, 2023, a federal grand jury returned an indictment charging William Robert Dunfee with six counts, including, 18 U.S.C. §§ 1512(c)(2), 2; 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), and 18 U.S.C. § 1752(a)(4) and 40 U.S.C. § 5104(e)(2)(F). On January 22, 2024, Dunfee was convicted of 18 U.S.C. § 231(a)(3) (Count One); 18 U.S.C. §§ 1512(c)(2), 2 (Count Two); and 18 U.S.C. § 1752(a)(1) (Count Three) following a bench trial. Subsequently, the Supreme Court decided *Fischer v. United States*, which was concerned with the scope of 18 U.S.C. § 1512(c)(2). On August 6, 2024, the Court dismissed the 18 U.S.C. § 1512(c)(2) charge (Count Two). ECF No. 76.

## IV.    STATUTORY PENALTIES

Dunfee now faces sentencing on 18 U.S.C. § 231(a)(3) (Civil Disorder) and 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds).

As noted by the Presentence Report issued by the U.S. Probation Office, the Defendant faces up to five years imprisonment and a $250,000 fine associated with Count One, and one year of imprisonment and a $100,000 fine associated with Count Three.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government proffers that the Sentencing Guidelines calculation for Dunfee set forth below is correct:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Involved Physical Contact | +3 |
| U.S.S.G. § 3B1.1(a) | Leadership Enhancement | <u>+4</u> |
| | **Total** | **17** |

Count Three: 18 U.S.C. 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(c)(1) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Involved Physical Contact | <u>+3</u> |
| | **Total** | **13** |

After grouping, the defendant's combined guidelines level is 17.

## A.  Leadership Enhancement

The government respectfully disagrees with U.S. Probation's omission of the leadership enhancement under U.S.S.G. § 3B1.1(a) in the Presentence Report. A four-point adjustment should be added for Dunfee's role in Count One. Under U.S.S.G. §3B1.1(a), an adjustment should be made where the "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

The following non-exhaustive factors are instructive in determining whether to apply the adjustment and, if so, whether to add three or four levels:

> "[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

U.S.S.G. § 3B1.1, comment. n.4. No single factor is dispositive. *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014). While the court must examine the degree of "control" the defendant exercised over other criminally culpable individuals, *id.*, this factor "alone does not determine whether the sentence can be increased" pursuant to Section 3B1.1. *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994); *see also United States v. Brodie*, 524 F.3d 259, 270-71 (D.C. Cir. 2008) (noting the "several" factors that must be considered in addition to "control"). The Circuit has further explained that it understands "control" to "connote some sort of hierarchical relationship" among the participants in the criminal enterprise. *Olejiya*, 754 F.3d at 990. The D.C. Circuit has "found the requisite hierarchical relationship" in several cases. *See, e.g., id.* at 991 (recruited some members and supervised others in check-cashing scheme); *Brodie*, 524 F.3d at 270-71 (recruited members and "coordinated the group's efforts"); *United States v. Wilson*, 240

F.3d 39, 46-47 (D.C. Cir. 2001) (recruited and directed others in bank fraud scheme); *United States v. Norman*, 926 F.3d 804, 812 (D.C. Cir. 2019) ("recruited, managed-supervised, and took a large share of proceeds"). And, when the Circuit has found the "hierarchical relationship" lacking, it is often because the defendant had a different type of relationship with his accomplice. *See, e.g., United States v. Johnson*, 64 F.4th 1348, 1352-53 (D.C. Cir. 2023) (finding that defendant did not have the requisite hierarchal relationship and control over his estranged wife, particularly given the spousal relationship and that she agreed to help him despite her anger with him).

The enhancement is properly applied to Dunfee here.

Even before January 6, Dunfee recruited individuals to come to the Capitol, not simply to protest, but to affirmatively obstruct Congress. He told members of his congregation after the election: "They used to tell us, you know what, you settle your differences at the ballot. How did that work out for us? It's not over . . . We are heading to D.C. Who's going with us? January 4th through 6th . . . Are you ready?" Ex. 209. Dunfee gave the impression that he was leading a military operation with himself as the commander. As Norris later recalled in text messages about January 6: "[Dunfee] had a group of 40 people with him under his command" and "[Dunfee] brought and [sic] entire congregation of his church followers with him up on the hill." Attachment B.

Unlike many other rioters on January 6, Dunfee arrived at the Capitol well before then-President Trump even began speaking at the "Stop the Steal" rally. Exs. 202, 202a, 202b, and 210. He did not need to be told where the certification was happening on January 6 or given any additional encouragement to go to the Capitol; he was already prepared for action. Dunfee was no mere spectator, he led and organized his fellow rioters. He used his position as a pastor to

legitimize his efforts and stood on a raised platform with a megaphone to speak to those who were gathering. Exs. 202, 202a. Referencing the Capitol building, he promoted the idea that the crowd should "take it." Exs. 301, 301a.

After then-President Trump's speech, between approximately 12:00 p.m. and 1:10 p.m., Dunfee continued to incite the crowd from the raised platform with a megaphone to breach the barricades and "take" the Capitol. Dunfee told the crowd: "If they let us down, we are going to our house!" (Exs. 203, 203c), "Fight for Trump! Hold the line!" (Exs. 203, 203e), and that "if Donald Trump is not coming, we are taking our house!" (Exs. 203, 203f). He also played the part of ground commander by directing rioters to different parts of the Capitol, specifically to the West Front, in support of rioters who were violently fighting police officers for control of the barricade line there. Exs. 203, 203d. Dunfee's rhetoric and direction were so impactful that, years later, rioters like Norris and Wright remembered Dunfee's influence. *See* Attachment A.

Notably, Dunfee's audience recognized him as a leader. Members of the crowd looked to him lead them into the Capitol building, Exs. 301, 301a (Unidentified Individual to Dunfee: "Let's go in." Dunfee: "We're going to."), and even to negotiate with officers, Exs. 303, 303a (unidentified male speaking to Dunfee, "[Y]ou do what you got to do to negotiate"). The Court will hear from Wright, who viewed Dunfee as a leader because he was standing in front of the crowd, holding a bullhorn, and directing the actions of others. Similarly, police officers identified Dunfee as a leader among the crowd. Dunfee spoke at length to law enforcement officers on the barricade line, as the crowd's representative. After the second push at 2:00 p.m., as officers were overwhelmed with individuals flooding toward the Capitol building, at least one officer singled out Dunfee and attempted to prevent his advance. Exs. 102, 102a.

In two egregious examples of his leadership and organizing others to riot, Dunfee used emissaries to go into the crowd and find him individuals who would help him breach the barricades. First, Dunfee utilized Associate 1 to recruit members of the Proud Boys to breach the barricades. Associate 1, who knew Dunfee prior to January 6, is shown near Dunfee in multiple exhibits and can be heard on a megaphone on at least one occasion repeating Dunfee's statements and calling him "Pastor Bill." Ex. 204. Prior to then-President Trump's speech, Associate 1 spoke to members of the Proud Boys. Ex. 301. Associate 1 made statements to Proud Boys members about "taking" parts of the building (*id.*), and according to one Proud Boys member, Associate 1 wanted the group "to go through the gates to the steps of the Capitol" (Attachment C). After speaking to Proud Boys members, Associate 1 found Dunfee, and then Dunfee and Associate 1 returned to meet Proud Boys members together. Ex. 301, 103a. Immediately after speaking with Proud Boys members, Dunfee returned to the flowerbed and addressed the crowd: "What's the purposes of these gates right here? What's the purpose of these gates? It's to keep you away from our house." Ex. 301a.

Second, as Wright will testify, an unidentified man in a beige coat approached Wright and brought him to Dunfee. Dunfee met with Wright and five additional men, one of whom Wright identified as Norris, and Dunfee laid out his plan. Dunfee asked the six men to help him breach the barricades, instructed them to spread out across the barricade line to overwhelm outnumbered police officers. Dunfee advised Wright that he would use a prayer to signal the men to begin their attack. As shown in Exhibit 411, Wright and Norris were directly beside Dunfee as they breached the barricades together at 1:45 p.m. This was the first breach of the barricades on the East Front.

In light of all of these factors, the organizer/leader aggravating role enhancement under §3B1.1(a) applies. If the Court does not apply this enhancement, the government asks the Court to apply the two-level adjustment under U.S.S.G. § 3B1.1(c). Regardless of which enhancement is applied, or if any leadership enhancement is applied at all, the Court should vary upwards to account for Dunfee's leadership role, abuse of his position of trust as a pastor, and corrupt intent to obstruct the certification.

### B.  Acceptance of Responsibility

The final Presentence Report determined that acceptance of responsibility does not apply to Dunfee. PSR ¶ 89. The government concurs. Prior to trial, Dunfee agreed to stipulations, including that his conduct met the elements for Counts One and Three. In assessing acceptance of responsibility, the guidelines provide a list of factors the Court should consider. § 3E1.1(a) Comment 1. "A determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." § 3E1.1(a) Comment 2.

Prior to trial, Dunfee expressed no remorse or accountability. As detailed above, Dunfee blamed the government for targeting him and claimed he was a peacemaker on January 6 who prevented barricades from being overrun—an assertion that is clearly belied by the evidence. He expressed pride in his actions and those of the other rioters, whom he called "patriots."

Dunfee claims he would have pled guilty but for appellate issues with 18 U.S.C. § 1512(c)(2). PSR ¶ 60. However, the evidence contradicts this claim. Approximately five months prior to trial, Dunfee rejected the government's offer for an almost identical stipulated bench trial. The terms of the parties' agreement contemplated a stipulated trial that would have allowed Dunfee to plead guilty while preserving all legal challenges associated with the aforementioned

obstruction charge. Dunfee rejected the offer based on the proposed stipulated facts presented by the government, requiring the government to continue to expend additional resources to prosecute the case and prove key material facts. Dunfee delayed his agreement to stipulations until one week before trial, after the government had to prepare witnesses. The stipulated facts that Dunfee ultimately agreed to were largely identical to those he had previously rejected, albeit inexhaustive and requiring the government to put on additional evidence at trial and sentencing.

### C. Section 4C1.1

The final Presentence Report determined at Section 4C1.1 does not apply. PSR ¶ 90. The government concurs. Section 4C1.1 does not apply in this case because of Dunfee's personal use of violence and credible threats of violence against people or property under a totality of the circumstances. Under §4C1.1, a defendant is only eligible for an adjustment where, among other things, "the defendant did not use violence or credible threats of violence in connection with the offense", (§4C1.1(a)(3)), and "the defendant did not receive an adjustment under §3B1.1 (Aggravating Role)", (§4C1.1(a)(10)). Dunfee does not meet these criteria. First, Dunfee's conduct on January 6 was violent. Dunfee violently pushed fencing against officers on two separate occasions as the Court recognized at trial. Jan. 22, 2024 Tr. 106:6-107:3 (The Court: "But what about his physical actions? He is clearly, forcibly acting against the police."). Dunfee also used a credible threat of violence on January 6. Prior to and while pushing fencing Dunfee explicitly threatened violence. He told officers they could "fight [the rioters]." He requested that individuals move to the West Front of the Capitol, where there was ongoing violence against police officers. Jan. 22, 2024 Tr. 106:6-107:3 (The Court: "Reinforcement to do what? You don't need reinforcement if you are not taking some forceful action."). He also warned officers that the rioters

were coming if then-President Trump did not show up. Dunfee's actions and any one of these statements preclude an adjustment under §4C1.1(a)(3).

In similar situations, courts have found such conduct precludes a sentencing adjustment under this provision. *See, e.g.*, *United States v. Reyher*, 23-cr-138 (RBW), Sent'g Tr. 2/27/24 at 15-16 ("it does seem to me that if you are cognizant of the fact that the police are seeking to inhibit the movement of a crowd and you participate in that, obviously the only way you're going to get past the police, since they are not permitting you to do so, the only way you're going to get by them is through violence. You can't, you know, it seems to me, take the position I did not intend to engage in violence when the objective of trying to get to where you wanted to go would necessitate the use of violence to accomplish that objective."); *see also, United States v. John Douglas Wright*, 21-cr-341-CKK, ECF No. 76, Memorandum Opinion of Judge Kollar-Kotelly (finding that Wright's conduct of pushing metal fencing against police officers on the East Front threatened to cause physical violence).

Second, the government believes an adjustment should apply under Section 3B1.1. This separately makes the defendant ineligible for the Section 4C1.1 adjustment.

### D.  Sentencing Guidelines Calculation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 94. The U.S. Probation Office did not apply points for Dunfee's aggravating role under U.S.S.G. §3B1.1(a) and calculated Dunfee's total offense level as 13, with a guidelines range of 12 to 18 months of imprisonment. The government disagrees with Probation's omission of the leadership enhancement for the reasons expressed above, and

calculates Dunfee's total adjusted offense level as 17, with a guidelines range of 24 to 30 months' imprisonment.

## VI.    DEPARTURES AND VARIANCES

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Dunfee's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

Dunfee was an avid and willing participant in an unprecedented crime. Speaking through a megaphone from a makeshift pulpit, Dunfee blasted hours of incendiary vitriol into the crowd of January 6 rioters on the East Front of the Capitol. In the words of another rioter, Dunfee "took it to another level." Dunfee was instrumental in rousing the mob to descend upon the Capitol building, in the process threatening the lives of legislators and their staff, interrupting of the certification of the 2020 Electoral College vote count, injuring more than one hundred police officers and resulting in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Dunfee "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in this Defendant's Guidelines ranges as calculated by either the Probation Office or the government reflects these facts. Dunfee would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[4] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. A sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate

---

[4] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024), demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

punishment for the offense. U.S.S.G. § 5K2.7.[5] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

Moreover, § 5K2.21 provides that "[t]he court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range." Here, Count Three, 18 U.S.C. § 1752(a)(1) does not factor into the sentencing guidelines because of how the counts are grouped. Dunfee would receive the same sentence if he had committed civil disorder outside of a restricted area. Moreover, the government agreed to dismiss three additional charges in exchange for Dunfee's agreement to certain stipulations. These crimes did not enter into the determination of the defendant's Guideline range, but the Court should rightly consider the substance of those offenses as another basis for an upward departure.

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this District have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read, and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent'g Tr., at 67. But just as the history books will describe the crimes of January 6, so will

---

[5] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.[6]

Indeed, even before *Fischer*, the Court and other judges of this Court gave significant upward departures and/or variances when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

And several judges of this Court have upwardly departed in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38-BAH, Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

---

[6] "January 6th wasn't an ordinary violent riot but one that interfered with the counting of electoral votes and the peaceful transition of power, which is one of the bedrocks of our democracy." *United States v. Perkins*, 21-CR-147-CJN, Sent. Tr. at 53.

Recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant, like Dunfee, who was convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. And, as in Dunfee's case, prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss Sparks' § 1512(c)(2) count.[7] At sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posted a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and §5K2.21, and based on the facts of that case, sentenced Sparks to 53 months of imprisonment.

---

[7] The sentencing transcript is attached here as Attachment E.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Because the seriousness of the defendant's crime is not adequately captured by the applicable Guideline, an upward departure is appropriate here as well. If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed the defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote

in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In past sentencings, this Court has made clear its view that January 6 was "a beginning of what results in the destruction of democracy." *See United States v. Donnie Duane Wren*, Sent'g Tr. 10/16/23 at 65. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[8]

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided. The lie that the election was stolen and illegitimate is still being perpetrated." *United States v. Cleveland*, 21-CR-159-ABJ,

---

[8] *See* https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html, *last visited* Sept. 9, 2024.

Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

In addition to departing upwards, other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt*, 21-CR-87-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-368-TJK, Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[9]

---

[9] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in

In this case, the government submits that an upward departure of 18 months is warranted from the government's calculation to reach an appropriate sentence. As discussed below, similarly situated defendants have received sentences of around 48 months of incarceration.

## VII.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Dunfee's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Dunfee riled up the crowd for hours with a megaphone, alternately sermonizing and encouraging rioters to break through barricades and challenge the police. Dunfee's role in "pumping" and "working" the crowd with his megaphone, and later his own physical aggression against police, were of the utmost seriousness and fully support the government's recommended sentence of 48 months incarceration.

### B.  The History and Characteristics of the Defendant

Dunfee is a 59-year-old man from Coshocton, Ohio. PSR ¶101. He currently serves, and at the time of his offenses did serve, as a co-pastor with his son at New Beginnings Ministries in

---

the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

Warsaw, Ohio. PSR ¶ 125. Dunfee told U.S. Probation that he was in "failing health". PSR ¶ 113. Medical records do not support this claim. Dunfee specifically identified to U.S. Probation some health concerns, many of which have been treated or for which he is currently being treated. PSR ¶¶ 114-17. There is nothing to suggest that the Bureau of Prisons cannot handle treatment of Dunfee's medical conditions. Therefore, none of the age or health concerns that Dunfee has identified should affect his sentence.

Dunfee is associated with a religious organization Pass the Salt Ministries, as well as other groups including "Minutemen United" and "Operation Save America," which organize protests in central Ohio and throughout the country. For over 20 years, Dunfee, together with various groups, has taken on a public role as a religious activist, leading protests at the removal of a Ten Commandments monument in Montgomery, Alabama in 2001 and 2003, occupying the grounds of Columbus City Hall for six days in Columbus, Ohio in 2004, protesting at a gay pride parade in Columbus in 2008, frequently protesting at abortion clinics in Clintonville and Columbus, Ohio between 2004 and 2010, and protesting at the trial of Kim Davis in Rowan County, Kentucky in 2015, among other examples.[10] On at least two occasions prior to January 6, 2021, Dunfee's activities exceeded First Amendment-protected conduct and he was arrested. To be clear, Dunfee's role as a religious activist has no bearing in the government's allocution. His constitutional rights are and should be protected, including his right

---

[10] *See, e.g.,*
*https://video.twimg.com/ext_tw_video/1566113333329235970/pu/vid/480x270/lyJ0a3idFol1EACX.mp4?tag=12* (Dunfee describes history of activism) (last visited August 22, 2024); https://freepress.org/article/dominionists-stage-weeklong-occupation-columbus-city-hall (last visited August 22, 2024); http://theoconia.blogspot.com/search/label/Bill%20Dunfee (last visited August 22, 2024); https://www.youtube.com/watch?app=desktop&v=gXHEy3hAq0I (last visited August 22, 2024).

to advocate for his religious beliefs. But the Court can and should consider his actions, and whether he understands the gravity of the crimes at issue. The fact that he was previously arrested for such conduct suggests that past may be prologue.

Dunfee has one prior misdemeanor conviction. On March 25, 2005, Dunfee was arrested for trespassing in Pinellas Park, Florida. PSR ¶ 93. The defendant and others were arrested for trespassing at Woodside hospital when they tried to take water to Terry Schiavo, who was then in hospice. In August 2021, prior to his arrest in the instant case, the defendant plead guilty to the pending charge in Florida (16 years after being charged), and he was sentenced to pay a fine and court costs. PSR ¶ 93.

In 2014 and 2015, Dunfee was the subject of public reporting based on a years-long dispute between Dunfee and a strip club located in Coshocton County, Ohio.[11] Dunfee and members of his church protested outside of the strip club, and topless dancers responded by protesting outside of Dunfee's church. *Id.* At some point, Dunfee was accused of trespassing too close to the strip club and he was arrested. *Id.*[12] The disposition of those charges remains unknown.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Dunfee's criminal conduct on January 6 was the epitome of disrespect for the law.

---

[11] *See* Gabriel, Trip, "From Pole to Pulpit, a Club and a Church Do Battle," *available at* https://www.nytimes.com/2014/09/22/us/22pastor.html (last visited August 22, 2024).
[12] *See also* Hayhurst, Leonard, "Church protests after pastor arrested at strip club," *available at* https://www.coshoctontribune.com/story/news/local/2014/09/08/church-protests-sheriffs-office-pastor-arrested/15284151/ (last visited August 22, 2024).

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, although Dunfee has a criminal history category of I, his actions on January 6 show a clear pattern of disrespect for the law and a desire to use political violence for his purposes. *See* Section VI(B) *supra.* Dunfee actively encouraged people to storm the Capitol building. He recruited individuals whom he believed could help him push down barricades. He ignored police commands and threatened officers. He was a leader who directly contributed to officers' inability to prevent people from entering the restricted area and, later, the Capitol building. On January 6, Dunfee made a volatile and dangerous situation on the East Front significantly worse and used his effective bully pulpit to amplify the chaos.

Second, although the defendant has now expressed *some* remorse, his statements after January 6 showed none. Instead, he indicated that he was proud of his actions by calling rioters patriots. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Even after Dunfee was arrested, he continued to deny any responsibility for his conduct and blame the government. As detailed above, Dunfee denied any responsibility for the violence that evidence at trial showed he encouraged and participated in. He went as far as to imply that his actions on January 6 were heroic as he "prevented the Capitol Building barricade from being broken", "tried to stop people from advancing up the Capitol Building steps", and "tried to stop someone from breaking into the Capitol Building." Ex. 421. Evidence has shown these claims to be untrue.

In advance of sentencing, Dunfee told U.S. Probation, "[T]he events of January 6, 2021 did not turn out as I expected. My intentions were to solely exercise my First Amendment right. I sincerely regret my actions of pushing into the bicycle racks and interfering with the Capitol police and their ability to control the crowd. My sincere apologies to any and all law enforcement who felt threatened by my actions." PSR ¶ 60. The Court should not credit Dunfee's attempt to rationalize or minimize his conduct, since the Court has already found at trial that Dunfee's intent exceeded the scope of mere protesting and, instead, constituted corrupt intent to obstruct the certification. Likewise, Dunfee's apology to "law enforcement who felt threatened" falls short of acknowledging his own violent actions against those officers. Dunfee's statement sounds more like "I'm sorry that you felt threatened" than "I'm sorry that I threatened you." A period of significant incarceration is necessary to ensure Dunfee does not pursue similar conduct in pursuit of his political goals or for any other reason.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

Here, the guidelines are the beginning, but not the end, of this specific case's analysis and the government's ultimate recommendation.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[15] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

**United States v. Gilbert Fonticoba, 1:21-cr-00638 (TJK)**. After a stipulated bench trial, Judge Kelly found Fonticoba guilty of violating 18 U.S.C. §§ 1512(c)(2), 2 and 18 U.S.C. § 231(a)(3). He was sentenced to 48 months of incarceration for his participation in the January 6 riot. Fonticoba went to Washington D.C. on January 6, 2021 as part of the Proud Boys. He tore down fencing on the West side of the Capitol building and was part of a surge that overwhelmed officers and successfully moved the crowd onto the stairs. He ultimately made it into the building, where he remained for a few minutes.

Like Dunfee, Fonticoba prepared for the events of January 6. Both were aware of the importance of the certification and were present at the Capitol to disrupt it. Additionally, both defendants were among the first rioters that breached police lines at the Capitol. Fonticoba was a follower who was at the Capitol to do the bidding of Proud Boy leaders. Dunfee, however, was a megaphone leader. He rallied the crowd to his corrupt cause and searched for individuals to push barricades, so that he could break through to the restricted area. Finally, both men expressed that they were proud of what they had done. Dunfee congratulated rioters exiting the building on

---

[15] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

January 6. Later, Dunfee denied any involvement in violence and, in the months and years later, called rioters at the Capitol "patriots".

**United States v. Timothy Louis Hale-Cusanelli, 1:21-cr-00037 (TNM)**. Hale-Cusanelli was convicted after a trial of 18 U.S.C. §§ 1512(c)(2) and four misdemeanors. For his conduct he was sentenced to 48 months in prison. The Court did not apply enhancements under 2J1.2(b)(1)(B) and (b)(2), making Hale-Cusanelli's guidelines 21-27 months. Despite that the Court applied an upward variance.

On January 6, 2021, Hale-Cusanelli, who was enlisted in the United States Army Reserves, went to the U.S. Capitol where he, like Dunfee, screamed at and interfered with USCP officers. Hale-Cusanelli was a lone actor who waived rioters forward but did not otherwise attempt to provoke rioters to action as Dunfee did through rhetoric and collaboration. Hale-Cusanelli made it into the Capitol building where he tried to prevent an officer from arresting another rioter, whereas Dunfee was prevented from entering due to police action. After January 6, Hale-Cusanelli made violent and racist remarks that factored into the Court's decision to vary upward. Dunfee's remarks after January 6 may not been racist but are undeniably dangerous. Dunfee called rioters patriots, blamed the government for investigating him, and disavowed any responsibility. In fact, Dunfee's remarks after his arrest made him seem like he was being helpful to police, which the evidence shows to be false. Additionally, Dunfee was more violent than Hale-Cusanelli on January 6. Dunfee directly pushed barriers into police officers attempting to protect the building on two separate occasions.

**United States v. John Douglas Wright, 1:21-cr-00341 (CKK)**. Wright pled guilty to 18 U.S.C. § 1512(c)(2) on August 2, 2022, and was sentenced to 49 months' incarceration on May 6,

2023. On January 6, 2021, Wright brought two busloads of individuals to Washington D.C. Wright was clearly preparing for conflict as earlier in the day he wrote to an associate on Facebook "ALMOST WAR TIME." He went to the East Front of the Capitol on January 6 where he listened to Dunfee instruct and encourage rioters to obstruct the Certification. He pushed barricades alongside Dunfee at 1:45 p.m. After which, he sat down while Dunfee continued to try breach the barricades. Unlike Dunfee, Wright went into the Capitol building where he walked around for approximately 11 minutes and smoked a cigarette inside. Dunfee was deterred from entering the building, but he remained near the doors congratulating rioters who had obstructed Congress, proclaiming, "Mission accomplished!"

Both Wright and Dunfee prepared for January 6, 2021. Both pushed the barricades together. Unlike Wright, Dunfee took on a leadership role on the East Front, using a bullhorn to encourage the crowd to take the Capitol. Dunfee recruited Wright and others to breach the barricades and encouraged people to get into the building. Additionally, Wright pushed barricades against law enforcement on one occasion, whereas Dunfee pushed barricades against law enforcement on two separate occasions. Dunfee's role is at least as aggravated as that of Wright's and the Court's sentence should reflect the seriousness of his actions.[16]

## VIII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

---

[16] With respect to their history and characteristics, Dunfee and Wright are both from Ohio (although they did not know each other prior to January 6). Dunfee and Wright both scored a criminal history of category I. Dunfee and Wright are of the same approximate age and health.

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes,

the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[17]

Because the Defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

---

[17] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Dunfee to pay $2,000 in restitution for his convictions on Counts One and Three. This amount fairly reflects Dunfee's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## IX.    FINE

Dunfee's convictions for violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $250,000 for Count I and $100,000 for Count III. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Dunfee has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). As detailed above, Dunfee has also engaged in numerous fundraising efforts. He represented in a filing that through

fundraising efforts he has raised $25,250 toward his legal fees. ECF No. 82. The guidelines fine range here, at a guidelines level 17, is $10,000 to $95,000. U.S.S.G. § 5E1.2(c).

## X.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 48 months of incarceration, 24 months of supervised release, a $125 special assessment, and $2,000 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      *s/ Will N. Widman*
         WILL N. WIDMAN
         NC Bar No. 48158
         Trial Attorney, Detailee
         1301 New York Avenue NW, 8th Floor
         Washington, DC 20530
         (202) 353-8611
         Will.Widman@usdoj.gov

         KATHRYN E. BOLAS
         Assistant U.S. Attorney
         NY Bar No. 5704234
         United States Attorney's Office
         601 D Street, NW
         Washington, D.C. 20530
         (202) 252-0872
         Kathryn.Bolas@usdoj.gov